IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| DONALD M. PARADIS, | ) | |
| | ) | Case No. CV-03-150-N-BLW |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM J. BRADY, Individually | ) | |
| and in His Official Capacity; | ) | |
| KOOTENAI COUNTY, a Political | ) | |
| Subdivision of the State of Idaho; | ) | |
| GLEN E. WALKER, Individually | ) | |
| and in His Official Capacity | ) | |
| as the Former Kootenai County | ) | |
| Prosecutor; D. MARC HAWS; | ) | |
| PETER C. ERBLAND; GEORGE | ) | |
| ELLIOT, Individually and in Their | ) | |
| Capacities as Agents of Kootenai | ) | |
| County; and DOES A Through D, | ) | |
| Fictitiously-Named Persons, | ) | |
| | ) | |
| Defendants. | ) | |

Pending before the Court in this case are the following Motions ripe for

adjudication: Motion to Strike Affidavits of Donald Paradis and Daniel Sharp

(Docket No. 182); Motions to Strike Affidavit of William Mauk (Docket Nos. 189,

190, 191, and 192); Paradis' Motion for Leave to File An Amended Complaint

(Docket No. 193); Motion for Summary Judgment filed by D. Marc Haws (Docket

**MEMORANDUM ORDER - 1**

No. 138); Motion for Summary Judgment Based on Qualified Immunity filed by George Elliot (Docket No. 145); Motion for Summary Judgment Based on Absolute and Qualified Immunity filed by Glen E. Walker and Peter C. Erbland (Docket No. 152); Motion for Summary Judgment filed by William J. Brady (Docket No. 156); Motion to Dismiss filed by William J. Brady (Docket No. 157); Paradis' Motion for Leave to File a Second Amended Complaint (Docket No. 193); and Paradis' Motion for Extension of Time to File List of Lay and Expert Witnesses and Motion to Amend Scheduling Order (Docket Nos. 200-1 and 200-2).

The Court heard oral argument on the Motions for Summary Judgment and Motion to Dismiss on January 20, 2006.  Having reviewed the record in this case, and having considered the arguments of the parties, the Court enters the following Order.

# I.

## PRETRIAL SCHEDULE

The Court previously set a two-step pretrial schedule, including a deadline for the parties to proceed with limited discovery and file motions for summary judgment on absolute and qualified immunity, and a later deadline for the filing of motions for summary judgment on any remaining substantive claims.  Several of

the defendants have included requests for dismissal of claims on grounds other than immunity in their current motions, likely for reasons of judicial efficiency. The Court will dismiss only those claims that would not be affected by further discovery, such as those barred by the Idaho Tort Claims Act or the statute of limitations.

In addition, Dr. Brady has filed a motion to dismiss the substantive claims in the amended complaint. Paradis has not filed a response. The Court assumes that Paradis intends to rest on his Response to Dr. Brady's Motion for Summary Judgment as a response to the Motion to Dismiss, as the subject matter of both is nearly the same.

The Court also notes, for economy's sake, that it has not addressed every argument of the parties. Those arguments of the parties not specifically addressed should be deemed rejected by the Court or mooted as a result of other portions of this decision.

Paradis has filed a Motion for Extension of Time to File List of Lay and Expert Witnesses and Motion to Amend Scheduling Order (Docket Nos. 200-1 and 200-2). The Court agrees with Defendants that Paradis should have disclosed his lay and expert witnesses according to the previous schedule set by the Court or should have filed for an extension of time within the deadline period, not after, as

**MEMORANDUM ORDER - 3**

he did.  It is better for a party to meet a deadline by making a good faith disclosure of all known witnesses and include a request to supplement the list, than to ignore the deadline altogether.

Despite Paradis' counsels' dilatory actions, the Court sees no particular prejudice that will occur to Defendants if Paradis files his list immediately and if the Court shortens Paradis' time for disclosure of rebuttal experts and opinions in order to provide Defendants with time for discovery.  Therefore, the Court will grant in part and deny in part the motion, giving Paradis a deadline of April 14, 2006, in which to make his lay witness and expert disclosures, and allowing Defendants additional time for disclosure of their experts.  The Court will allow Defendants the right to request exclusion of Paradis' experts at trial if Defendants are able to identify any particular prejudice that has arisen as a result of Paradis' failure to follow the witness disclosure schedule.

## II.

## SUMMARY OF PARADIS' CLAIMS

The following claims are asserted in Paradis' Amended Complaint.

| Claim No. | Claim Substance | Defendants |
|---|---|---|
| Count I | Failure to train in the requirements of Brady v. Maryland under § 1983 | Walker, Kootenai County |
| Count II | Failure to train not to arrest or institute | Walker, Kootenai County |

**MEMORANDUM ORDER  -  4**

prosecutions absent probable cause

| | | |
|---|---|---|
| Count III | Failure  to train not to fabricate and present fabricated evidence | Walker, Kootenai County |
| Count IV | Malicious prosecution under § 1983 | Elliot, Brady |
| Count V | Pre-arrest conspiracy to fabricate jurisdiction and probable cause under § 1983 | Elliot, Brady, Haws, Erbland, Walker, Kootenai County |
| Count VI | False procurement of an arrest warrant in violation of Fourth Am. and § 1983 | Elliot |
| Count VII | State law negligent training and supervision | Walker, Kootenai County |
| Count VIII | State law intentional infliction of emotional distress | Brady |
| Count IX | State law false light invasion of privacy | Brady, Haws |
| Count X | State law negligent and intentional infliction of emotional distress | Haws |
| Count XI | Conspiracy to withhold exculpatory evidence in violation of Sixth Am. and § 1983 | Brady, Elliot |

Claims I, II, III, and VII are not at issue in this round of summary judgment

motions.

# III.

# MOTIONS TO STRIKE

## A.   Motion to Strike Affidavits of Donald Paradis and Daniel Sharp (Docket No. 182)

Defendants have moved the Court to strike the Affidavit of Daniel Sharp

(Docket No. 169-6).  By his Affidavit offering factual evidence (*e.g.*, the distance

from the border of Idaho to Mellick Road is seven miles), Mr. Sharp is making himself a witness regarding the factual circumstances of the case.  Because there is insufficient foundation in the Affidavit to support Mr. Sharp's factual statements, the Court will strike the Affidavit.

The Affidavit of Donald Paradis (Docket No. 169-7) states that Mr. Paradis has knowledge that Defendants defamed him at various times.  The Court will not strike the Affidavit because Mr. Paradis purports to have personal knowledge of the alleged defamation.  The Court does not consider the Affidavit as providing proof of defamation, but only providing proof that Mr. Paradis has identified instances that may support the allegations of defamation, including the known dates of the alleged defamation for statute of limitations purposes.

**B.    Motions to Strike Affidavit of William Mauk (Docket Nos. 189, 190, 191, and 192)**

Paradis' counsel William Mauk filed an Affidavit (Docket No. 188), with an accompanying DVD.  Mauk states that the DVD shows Defendants Brady and Haws in the course of their alleged defamation of Paradis.  Mauk also makes statements regarding his personal knowledge of requests to the State for discovery that should have produced the slides of Palmer's lung tissue.  The DVD showing newscasts favorable to Paradis are not admissible as evidence to show the truth of the matter asserted, but can be used to support Paradis' defamation and conspiracy

**MEMORANDUM ORDER  -  6**

claims.  Accordingly, the court will not strike the Affidavit and DVD, but will

consider them for limited purposes.

## IV.

## SUMMARY OF THE LAW GOVERNING
## IMMUNITY AND CONSPIRACY

**A.     Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material

facts are those which may affect the outcome of the case.  *See Anderson v. Liberty*

*Lobby, Inc*., 477 U.S. 242, 248 (1986).

In a motion for summary judgment, the moving party bears the "initial

burden of  identifying for the court those portions of the record which demonstrate

the absence of any genuine issues of material fact."  *T.W. Elec. Serv., Inc. v.*

*Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*

*Corp v. Catrett*, 477 U.S. 317, 322 (1986)).  If the moving party points to portions

of the record demonstrating that there appears to be no genuine issue of material

fact as to claims or defenses at issue, the burden of production shifts to the non-

moving party.  To meet its burden of production, the non-moving party "may not

**MEMORANDUM ORDER  -  7**

rest upon the mere allegations contained in his complaint, but he must set forth, by affidavits, exhibits or otherwise, specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56; *see T.W. Electric Serv.*, 809 F.2d at 630 (internal citation omitted).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences that can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted).

Rule 56(c) requires the Court to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252.

**B.     Qualified Immunity Generally**

In § 1983 actions, the doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate the plaintiff's clearly-established federal rights.

**MEMORANDUM ORDER  -  8**

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Contrarily, a state official may be held personally liable in a § 1983 action if he knew or should have known that he was violating a plaintiff's clearly-established federal rights.  *Id.*  True to its dual purposes of protecting state actors who act in good faith and redressing clear wrongs caused by state actors, the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

The threshold question in considering application of the qualified immunity defense is whether the facts alleged, viewed in a light most favorable to the plaintiff,  show that the defendant's conduct violated the plaintiff's constitutional rights.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the Court finds that a constitutional right appears to have been violated, it proceeds to the next step, which is to inquire whether the right was clearly established.  *Id.*  If the right was clearly established at the time of the alleged injury, qualified immunity does not apply.  *Id.*

## C.    Absolute Immunity Generally

While the United States Supreme Court has determined that qualified immunity is generally sufficient to protect the interests of government officials, it has also recognized "that some officials perform 'special functions' which, because

of their similarity to functions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993). The Supreme Court has determined that common law immunity considerations "support[] a rule of absolute immunity for conduct of prosecutors that was 'intimately associated with the judicial phase of the criminal process.'" *Id.* at 270 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). Defendants who "seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Butz v. Economou*, 438 U.S. 478, 506 (1978).

**D.    The Immunities in the Context of Civil Cases Arising from Criminal Prosecutions**

Based upon the foregoing principles, the Supreme Court has held that a prosecutor has absolute immunity for initiating and pursuing a criminal prosecution, *Imbler v. Pachtman*, 424 U.S. at 410, preparing and filing charging documents, *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997), and participating in probable cause hearings, *Burns v. Reed*, 500 U.S. 478 (1991). An investigator has qualified immunity for investigating criminal cases, *Buckley*, 509 U.S. at 273-74, or acting as the complaining witness in procuring an arrest warrant, *Malley v. Briggs*, 475 U.S. 335, 342 (1986). Similarly, because the immunity test is based upon function, a  prosecutor has only qualified immunity for "performing

**MEMORANDUM ORDER  -  10**

investigatory or administrative functions, or [when he] is essentially functioning as a police officer or detective."  *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) (relying on *Buckley v. Fitzsimmons*).  In *Kalina*, the Court cited a prosecutor's work in "plan[ning] and execut[ing] a raid on a suspected weapons cache" as an example of a police or investigatory function.  *Kalina*, 522 U.S. at 126 (internal citations omitted).  Another example of a prosecutor performing a police function is his authorization of a warrantless wiretap.  *Mitchell v. Forsyth*, 472 U.S. 511 (1985).

An example more closely related to the present case is found in *Buckley*. There, the Court held that absolute immunity was not appropriate where it was alleged that prosecutors fabricated evidence "during the early stages of the investigation" where "police officers and assistant prosecutors were performing essentially the same investigatory functions."  *Buckley*, 509 U.S. at 262-63.  In *Buckley*, the plaintiff alleged that prior to his arrest prosecutors "shopped" for an expert who would opine that a bootprint found at the scene matched plaintiff's boots, after three other experts could not support that opinion, and that prosecutors knew that the fourth expert was known for her willingness to fabricate testimony. "There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's

role in searching for the clues and corroboration that might give him probable

cause to recommend that a suspect be arrested, on the other hand," the *Buckley*

Court reasoned.  *Id*. at 273.

Case law provides no bright-line rule as to whether qualified or absolute

immunity applies.  Rather, the Court must always look to the function being

performed – whether it has a "functional tie to the judicial process," or whether it is

merely investigatory.  *Genzler v. Longanbach*, 410 F.3d 630, 637 (9th Cir. 2005)

(citing *Buckley*).[1]

Applying the function test, *Buckley* makes it clear that absolute immunity is

*not* available to a prosecutor for the "fabrication of evidence" to support "probable

cause," but that it *is* available for the "malicious prosecution of someone whom he

lacked probable cause to indict."  509 U.S. at 274.  Similarly, in *Milstein v. Cooley*,

257 F.3d 1004 (9th Cir. 2001), the Ninth Circuit noted that absolute immunity is

unavailable to prosecutors during the investigatory stage of the criminal

proceeding:

> Shopping for a dubious expert opinion is fabricating evidence,
> which is unprotected by absolute immunity.  *Buckley*, 509 U.S. at 276.
> It follows, then, that acquiring known false statements from a witness

---

[1]  *cert. denied* by *Thompson v. Genzler*, 126 S.Ct. 736 (Nov. 28, 2005);
*Longanbach v. Genzler*, 126 S.Ct. 737 (Nov. 28, 2005); and *O'Brien v. Genzler*, 126 S.Ct.
749 (Nov. 28, 2005).

**MEMORANDUM ORDER  -  12**

> for use in a prosecution is likewise fabricating evidence that is unprotected by absolute immunity.  This alleged conduct occurred before the grand jury was empaneled, *id*. at 275, before [the suspect] was arrested, *Burns*, 500 U.S. at 492, and it must necessarily have occurred before the existence of probable cause, *Buckley*, 509 U.S. at 274.

*Id*. at 1011.

However, even a finding of probable cause is not a bright-line dividing point between investigatory and quasi-judicial functions.  The *Buckley* Court explained:

> Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity for liability for all actions taken afterwards. Even after that determination . . . a prosecutor may engage in "police investigative work" that is entitled to only qualified immunity.

509 U.S. at 273 n.5.  In other words, after a probable cause determination, not all of a prosecutor's work is immune, but each step must be viewed in light of its function.  For example, "[w]itness interviews may serve either an investigative or an advocacy-related function, as may other methods of gathering or manufacturing evidence prior to trial."  *Genzler*, 410 F.3d at 638.  Prosecutors are absolutely immune "for gathering additional evidence after probable cause is established or criminal proceedings have begun *when they are performing a quasi-judicial function*."  *Broam*, 320 F.3d at 1030 (emphasis added).

The most recent Ninth Circuit case on this issue is *Genzler*, which relies on *Barbera v. Smith*, 836 F.2d 96, 100 (2d Cir. 1987).  The *Barbera* Court made this

**MEMORANDUM ORDER - 13**

helpful distinction between investigatory work and quasi-judicial work:

> As we see it, the pre-litigation function that a prosecutor performs has at least two aspects: (1) the supervision of and interaction with law enforcement agencies in acquiring evidence which might be used in a prosecution, and (2) the organization, evaluation, and marshaling of this evidence into a form that will enable the prosecutor to try a case or to seek a warrant, indictment, or order.

*Barbera*, 836 F.2d at 100.

In *Genzler*, the court determined that absolute immunity did not apply to a claim that an investigator and prosecutor coerced a witness into lying and changing her testimony during an interview, under circumstances where "the preliminary hearing at which the judge would decide whether there was probable cause to hold Genzler for trial in superior court was still over a month away."  410 F.3d at 639. The prosecutor and the investigator conducted the witness interviews for the purpose of "continuing the process of investigation into the facts that would inform whether there was such probable cause, and the precise charges on which [the suspect] would stand trial had yet to be determined."  *Id*. at 642.  The *Genzler* Court determined that the investigator was "engaged in the process of 'acquiring' or manufacturing evidence during the performance of an investigative function," and that there was sufficient evidence that could support a conclusion that the prosecutor "was actively directing police-type investigative actions by [the

investigator]."  *Id*. at 641.

The timeline of events in *Genzler* shows that it is function, rather than timing, that is the definitive factor in the immunity analysis:

| | |
|---|---|
| April 19, 1996 | Genzler turned himself in and was arrested. |
| April 23, 1996 | The criminal complaint was filed. |
| April 25, 1996 | The investigator interviewed the witness. |
| April 29, 1996 | The investigator and prosecutor interviewed the witness. |
| May 23, 1996 | Genzler's preliminary (probable cause) hearing, after which he was bound over for trial. |

In the course of its evaluation of the facts on a question of immunity, the Court must resolve any ambiguities in favor of the plaintiff.  *Genzler,* 410 F.3d at 642.  Defendants seeking immunity bear the burden of "showing that such immunity is justified for the function in question."  *Id*. at 636 (internal citation omitted).  In addition, "the presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties."  *Id*. at 636-37 (internal citation omitted).

E.    **Idaho's Criminal Procedures**

To put into perspective the actions the investigator and prosecutor took in Paradis, the Court provides the following overview of the first few steps in the

criminal process in Idaho:

1.  <u>Issuance of a warrant</u>.  "After a complaint is laid before a magistrate, (which may be in the form of the Idaho Uniform Citation for a misdemeanor), the magistrate may issue a warrant for the arrest of the defendant only after making a determination that there is probable cause to believe that an offense has been committed and that the defendant committed it."  *Idaho Criminal Rule 4(a).*

    If the magistrate holds a hearing on the complaint to determine whether to issue a warrant, the following apply: "The probable cause hearing is an informal nonadversary proceeding.  The finding of probable cause shall be based upon substantial evidence, which may be hearsay in whole or in part provided there is a substantial basis for believing that there is a factual basis for the information furnished.  It shall not be necessary for the defendant to be present at such hearing or to have the right to confrontation and cross-examination of witnesses, nor shall it be necessary to permit the defendant to have or to provide the defendant with counsel.  Before making the determination of whether there is such probable cause, the magistrate may require any person, other than the defendant, who appears likely to have knowledge relevant to the offense charged to appear personally and give testimony under oath.  The facts which the magistrate considers in determining probable cause shall be placed either in affidavit form and attached to the complaint or shall be testimony under oath placed upon the record.  In making the determination of probable cause, the magistrate shall consider all facts as to whether an offense has been committed and whether the defendant has committed it*." Idaho Criminal Rule 4(e).*

2.  <u>Initial Appearance</u>.  A magistrate must set an initial appearance for the defendant within 24 hours of his arrest (excluding weekends and holidays).  The court may appoint counsel and must advise the defendant of his rights.  *Idaho Criminal Rule 5.*

3.  <u>Preliminary Hearing</u>.  "Unless indicted by a grand jury, a defendant, when charged in a complaint with any felony, is entitled to a

preliminary hearing." *Idaho Criminal Rule 5.1(a)*. The preliminary hearing may be waived, or the 21-day time limit extended with the consent of the defendant. *Id*. "If from the evidence the magistrate determines that a public offense has been committed and that there is probable or sufficient cause to believe that the defendant committed such offense, the magistrate shall forthwith hold the defendant to answer in the district court. The finding of probable cause shall be based upon substantial evidence upon every material element of the offense charged; provided that hearsay in the form of testimony, or affidavits, may be admitted. . . provided that the magistrate determines the source of said evidence to be credible." *Idaho Criminal Rule 5.1(b)*. At the preliminary hearing, the defendant "shall be entitled to cross-examine witnesses produced against the defendant at the hearing and may introduce evidence in defendant's own behalf." *Id*.

**F.    Conspiracy**

One way to defeat a qualified immunity defense is to show that state actors conspired to deprive a person of his civil rights. The elements of a conspiracy to deprive another of his civil rights are as follows: "(1) the existence of an express or implied agreement among the [defendants] to deprive him of his constitutional rights; and (2) an actual deprivation of those rights resulting from that agreement." *Ting v. U.S.*, 927 F.2d 1504, 1512 (9th Cir. 1991) (*Bivens* action relying on § 1983 case, *Dooley v. Reiss*, 736 F.2d 1392, 1394-95 (9th Cir. 1984)).

To prove a conspiracy between state actors and a private party under § 1983, the plaintiff must bring forward evidence showing "an agreement or 'meeting of the minds' to violate constitutional rights." *Fonda v. Gray*, 707 F.2d 435, 438 (1983) (citation omitted). Each conspirator "need not know the exact details of the

plan, but each participant must at least share the common objective of the conspiracy." *Id*.  A  plaintiff cannot "defeat the properly supported summary judgment motion of a defendant charged with a conspiracy without offering 'any significant probative evidence tending to support the complaint.'" *Anderson v. Liberty Lobby*, 477 U.S. at 256.

**V.**

**HAWS' AND ELLIOT'S MOTION FOR SUMMARY JUDGMENT**
**(Docket Nos. 138 and 145)**

**A.    Summary of Claims Asserted Against Haws and Elliot**

Paradis asserts three claims against former Kootenai County deputy prosecutor Marc Haws in the Amended Complaint:

| | |
|---|---|
| Count V | a pre-arrest conspiracy to fabricate jurisdiction and probable cause under § 1983. |
| Count IX | a state law false light invasion of privacy claim. |
| Count X | a state law "negligence and intentional infliction of emotional distress claim." |

Paradis asserts four claims against Detective George Elliot:

| | |
|---|---|
| Count IV | Malicious prosecution under § 1983. |
| Count V | Pre-arrest conspiracy to fabricate jurisdiction and probable cause under § 1983. |
| Count VI | False procurement of an arrest warrant in violation of Fourth Amendment and § 1983. |

Count XI     Conspiracy to withhold evidence in violation of
                 Sixth Amendment and § 1983.

*See Amended Complaint* (Docket No. 122).

The Court will first address Count V, the conspiracy to fabricate jurisdiction

claim against Haws and Elliot and Count VI, false procurement of an arrest warrant

against Elliot because of the relatedness of the two claims.

**B.     Timeline of Relevant Facts**

The following are undisputed material facts, or, where disputed, reflect the

version of the facts construed in a light most favorable to Paradis:

June 21, 1980       Scott Currier was killed at Paradis' residence in Spokane.
                         *Elliot's Statement of Undisputed Facts*, Exhibit 12, at pp. 48-53
                         (Docket No. 145).

June 22, 1980       Paradis and two other men are seen riding in a Volkswagen van
                         in Idaho in the early morning, and twenty to thirty minutes later
                         seen walking on foot near the place where the bodies of Scott
                         Currier and Kimberly Palmer were found; there is a significant
                         rainstorm at the location where the bodies were found.  The
                         bodies are discovered late in the afternoon.  Detective Elliot
                         picks up the bodies from Yates Funeral Home and transports
                         them to Dr. Brady's office in Oregon for an autopsy.  Detective
                         Elliot attends the autopsies.  *Elliot's Statement of Undisputed
                         Facts*, Exhibit 1, at pp. 1-17 (Docket No. 145).

                         Idaho investigators complete a Report of Motor Vehicle
                         Accident and supplement.  The supplement noted that there was
                         a tear in the rear of Palmer's pants, and that the fly of the pants
                         was open and the left side torn thus exposing the pubic area.
                         *Affidavit of Marc Haws*, Exhibit B-3, Sheriff's Report, at p. 57

**MEMORANDUM ORDER  -  19**

(Docket No. 138-4).

June 23, 1980          Elliot transports the bodies back to Coeur d'Alene. *Id.* at p. 42.
                      Deputy County Prosecutor Haws begins work on the case.
                      *Haws Statement of Undisputed Facts*, at ¶ 7 (Docket No. 138-
                      2).

June 23, 1980          Dr. Brady dictates autopsy reports of Currier and "unidentified
                      white female."  The report lists the female's cause of death as
                      asphyxiation by manual strangulation.  The report does not list
                      a date, time, or place of death.  The report shows that the female
                      victim had a labial wound with no vital reaction.  *Elliot's
                      Motion for Summary Judgment*, Exhibit 17, Autopsy Report, at
                      pp. 8-24 (Docket No. 145-9).

June 24, 1980          Haws attends a Task Force Meeting with Elliot and the
                      Spokane investigators.  Haws writes down the note, "spoonful
                      of water in lungs – siphon prob.– dead when went in water,"
                      "no time of death either," "VF (female victim) strangled,"
                      "voice box broken 2 parts," "not sexually assaulted," along with
                      many other notes.  At this time, Elliot does not know "where
                      [Palmer] had been killed for sure." *Paradis' Counterstatement
                      of Facts*, Exhibit 2, at p. 12 (Docket No. 169-3).  Haws and
                      Kootenai County Sheriff Watson visit the crime scene on their
                      way back to Idaho.  *Haws Affidavit*, at pp. 1-24 (Docket No.
                      138-4).  Investigating officers at the meeting discussed whether
                      the evidence at the scene was consistent with Palmer attempting
                      to flee or being dragged to the location where her body was
                      found.  *Haws Affidavit*, at p. 14.  Both Elliot and Haws know
                      that the victim's body had a labial tear at some point prior to the
                      Arrest Warrant Hearing. *Paradis' Counterstatement of Facts*,
                      Exhibit 3, at p. 29 (Docket No. 169-2); *Haws Affidavit*, at ¶ 28
                      (Docket No. 138-4).

June 24, 1980          (or thereafter) Detective Elliot prepares police report showing
                      names of "Currier & Palmer."  Report is not dated, but shows a
                      chronology of events from June 22, 1980, to June 24, 1980.
                      *Haws Affidavit*, Exhibit B-1 (Sheriff's Report), at pp. 40-42

**MEMORANDUM ORDER - 20**

(Docket No. 138-4).

June 24, 1980 — Paradis, Gibson, and Amacher are charged with murder of Currier and Palmer in Washington state; Paradis is arrested and taken into custody in Washington.  At some time thereafter, prosecutors from Washington and Idaho agree that the Washington Currier murder case would proceed first, with no action on Palmer in Washington.  *Amended Complaint*, at ¶¶ 53-55.

June 25, 1980 — Elliot receives approval from his supervisor, Lieutenant Steel, to sign the affidavit to support the complaints for an Idaho arrest warrant for Paradis, Gibson, and Evans.  *Paradis' Counterstatement of Facts*, Exhibit 3 (Elliot Deposition of 2/27/87), at p.15 (Docket No. 169-2).  Elliot meets with Haws and attends the Arrest Warrant Hearing before Magistrate Judge Virginia Balser.  *Id*. at p. 16; Exhibit 11 (Arrest Warrant Hearing Transcript) (Docket No. 169-5).

June 27, 1980 — Kimberly Palmer's mother, Sherry Owen, positively identifies both bodies at the Yates Funeral home, although she had earlier provided a description of Palmer and Currier by telephone allowing an earlier identification.  *Elliot's Statement of Undisputed Facts*, Exhibit 9, at pp. 43-44 (Docket No. 145).

June 30, 1980 — Spokane County Fire Investigation Report completed.  *Elliot's Statement of Undisputed Fact*, Exhibit 7, at pp. 23-41 (Docket No. 145-7).

end of June or
early July 1980 — Haws first obtained information from Dr. Brady that Kimberly Palmer may have aspirated water.  *Paradis' Counterstatement of Facts, Exhibit 19* (Hearing Transcript), at pp. 1 & 3-4 (Docket No. 169-8).  At that time, Haws "talked to Dr. Brady on the telephone and [they] discussed [Brady's] findings."  *Id*. at p. 4.  Haws believes he communicated this information to Elliot and Erbland, although no time period is specified.  *Id*. at pp. 5 & 12-13.

| | |
|---|---|
| July 28, 1980 | Spokane County Sheriff's Department issues its written "Conclusions and Theories" on the Currier and Palmer investigation. *Elliot's Statement of Undisputed Fact*, Exhibit 15, at p. 1 (Docket No. 145-8). |
| September 1980 | Paradis and Gibson are acquitted of the Currier murder in Washington. Haws attends the trial. After the acquittals, Kootenai County seeks arrest warrants for Paradis and Gibson for Palmer's murder. *Amended Complaint*, at ¶¶ 57-58. |
| Nov. 26, 1980 | Paradis' arrest and initial appearance in an Idaho court. *Amended Complaint*, at ¶ 59. |
| Dec. 8-12, 1980 | Paradis' and Gibson's Preliminary Hearing. Erbland is the prosecutor. Dr. Brady's affidavit presented at the hearing shows that Palmer's death was caused by asphyxiation by strangulation. There is nothing in the affidavit regarding place or time of death. *Elliot Statement of Facts*, Exhibit 21, at pp. 69-70 (Docket No. 145-9). The aspiration of water theory is not raised at the preliminary hearing. *Paradis' Counterstatement of Facts, Exhibit 19* (Hearing Transcript), at pp. 5-6 (Docket No. 169-8). |
| | Paradis files a motion to dismiss (based on lack of Idaho jurisdiction) The aspiration of water theory is not presented by the State in response. *Paradis' Counterstatement of Facts, Exhibit 19* (Hearing Transcript), at pp. 5-7 (Docket No. 169-8). |
| April 1981 | Paradis bail hearing. The aspiration of water theory is first presented at this hearing by counsel. *Amended Complaint*, at ¶ 66(b) (Docket No. 122). |
| June 1981 | Brady travels to Idaho to meet with Haws to prepare for the Gibson and Paradis trials. *Amended Complaint*, at ¶ 71. At the Gibson trial, Brady testifies about Palmer's death as follows: "I think she inhaled water, exactly, that's what I think happened," and "I think there is a very strong likelihood that she was alive when she went in the water and inhaled some water, that is my |

MEMORANDUM ORDER - 22

opinion." *Id.* at ¶ 76.  Gibson admits his role in killing Palmer, but states that Palmer was killed in Spokane.  *Id.* at ¶ 67. Gibson is convicted of Palmer's murder in Idaho.  *Id.* at ¶ 80.

| | |
|---|---|
| August 11, 1981 | Haws writes a letter to a California District Attorney saying, "Our next big challenge is to convict [Paradis] in trial in December, and to get the needle ready for Mr. Gibson." *Paradis' Counterstatement of Facts,* Exhibit 20 (Docket No. 169-10). |
| December 1981 | Dr. Brady testifies in the Paradis trial similarly to his Gibson testimony. *Amended Complaint*, at ¶ 81. The aspiration of water theory is not found in any medical report or affidavit of Dr. Brady. *Paradis' Counterstatement of Facts, Exhibit 19* (Hearing Transcript), at pp. 16-17 (Docket No. 169-8). |
| Dec. 10, 1981 | Paradis is found guilty of murder in Idaho.  *Elliot's Statement of Undisputed Facts*, Exhibit 1, at p. 18 (Docket No. 145-7). |

## C.    Pre-Arrest Conspiracy Claim (Task Force Meeting) - Haws and Elliot

Haws may be entitled to *qualified* immunity if, like an investigator, he acquired evidence which might be used in a prosecution prior to the establishment of probable cause.  He may be entitled to *absolute* immunity if he was organizing, evaluating, and marshaling evidence acquired by others into a form that would enable him to seek a warrant, indictment, or order.  In other words, he must have been *personally, actively acquiring* evidence, or his conduct and decision-making on whether to prosecute is absolutely immune.  If he was personally acquiring or

**MEMORANDUM ORDER  -  23**

gathering evidence, he is still absolutely immune if it was done "after probable cause is established or criminal proceedings have begun so long as he was "*performing a quasi-judicial function*."  *Broam*, 320 F.3d at 1030 (emphasis added).

In addition, if Paradis shows that evidence of a conspiracy existed prior to establishment of probable cause and during an investigatory function, then qualified immunity is defeated.  Paradis' two theories of conspiracy are these:

> Pre-arrest, knowing they did not possess, and could not lawfully obtain, evidence which provided proof beyond a reasonable doubt that Plaintiff-Paradis murdered Kimberly Palmer, and that he committed this alleged crime in Idaho, the defendants entered into a plan, design and conspiracy to concoct evidence against Plaintiff-Paradis and present it as if fact, all in violation of rights protected by the Fourteenth Amendment.

> The theory that Palmer aspirated water was an idea contrived by Elliot, adopted and embellished by Haws, and promoted and sponsored by Dr. Brady, who then transposed the theory into his ostensibly informed opinion for the purpose for the Gibson and Plaintiff-Paradis trials.

*First Amended Complaint*, at ¶¶ 134-135 (Docket No. 122).

The Court previously left open for summary judgment the question of whether Haws was entitled to absolute immunity for his participation in the June 24, 1980 Task Force Meeting with Detective Elliot and the Washington detectives. Haws has brought forward evidence supporting his claim to prosecutorial

**MEMORANDUM ORDER  -  24**

immunity for his attendance and participation in the Task Force Meeting.  Paradis

has not come forward with anything in rebuttal to show  or create an inference that

Haws performed investigatory, police-type work at the Task Force Meeting.  The

record shows  that Haws' Task Force Meeting with Elliot was for the purpose of

evaluating the evidence that had been assembled by the Idaho and Washington

police officers to determine whether to pursue an arrest warrant.  Haws performed

no investigatory or police-type work at this meeting.  He did not direct that any

further investigatory work be done.

There is no evidence of a "meeting of the minds" to deprive Paradis of his

civil rights at this stage, as Paradis has alleged.  Dr. Brady was not present at the

Task Force Meeting.  There is no evidence that Haws met privately with Elliot,

who conducted the meeting, or that the group entered into a conspiracy against

Paradis.  Haws' notes do not show that he was performing investigatory work or

that there was any meeting of the minds with any alleged co-conspirator to deprive

Paradis of his constitutional rights.  Rather, his participation in the meeting was in

the nature of receiving evidence or evaluating evidence, both prosecutorial

functions.  Based upon all of the foregoing, the Court concludes that Haws is

entitled to absolute immunity for the Task Force Meeting, and that Elliot is entitled

to qualified immunity because no conspiracy to defeat qualified immunity has been

**MEMORANDUM ORDER  -  25**

shown at that stage.

**D.    Conspiracy Allegations after the Task Force Meeting and before Preparation of Arrest Warrant and Complaint (June 24 to June 25, 1980) - Haws and Elliot**

The next time period the Court reviews is that between the Task Force

Meeting on June 24, 1980, and the preparation of the affidavit of probable cause

and complaint on June 25, 1980.  On June 24, 1980, Elliott stated at the Task Force

Meeting that he "did not know for sure" where Palmer was killed.  *Paradis'*

*Counterstatement of Facts*, Exhibit 2, at p. 12 (Docket No. 169-3).  On June 25,

1980, Elliot signed the warrant affidavit stating that Palmer was killed in Idaho.

Also on June 25, 1980, Elliot testified at the Arrest Warrant Hearing that he could

not answer the question of whether Palmer was alive at the time that she arrived in

the Post Falls area, and that it may have been possible that she was alive when she

arrived in the area.  *See Paradis' Counterstatement of Facts,* Exhibit 11 (Arrest

Warrant Hearing Transcript), at p. 27 (Docket No. 169-5).

Paradis has alleged that Elliot and Haws entered into a conspiracy to

withhold the information contained in the autopsy report from the magistrate judge,

particularly, that Palmer's body had a large labial wound and that the wound "had

no vital reaction."  However, Paradis has come forward with nothing showing that,

even if Elliot or Haws had a copy of the autopsy report, they knew of the

significance of the labial wound 72 hours after the bodies were found.  In his

11/24/86 deposition, Elliot testified:

> Q.    Mr. Elliot, when Dr. Brady identified this cut on the labia
>       of the victim, do you remember him saying words to the
>       effect that it displayed no vital reaction?
>
> A.    I do remember that, yes.
>
> Q.    Do you know what that means?
>
> A.    Well, I'm going to guess that it didn't really have that
>       much meaning.

*Paradis' Counterstatement of Facts*, Exhibit 3, at p. 29 (Docket No. 169-2).

Similarly, Haws has declared: "The matter [of the jeans tear and labial tear] was

simply not an issue to me at the time given the lack of testing and forensic medical

information."  *Haws Affidavit*, at ¶ 28 (Docket No. 138-4).  Paradis has not shown

that Elliot and Haws had medical training or that there was some other basis by

which it could be inferred that Elliot and Haws knew the significance of the labial

tear without the benefit of an expert medical opinion.  *Haws Affidavit*, at ¶ 29

(Docket No. 169-4) ("At the time of the June 25, 1980 Probable cause hearing, and

during the subsequent prosecution of Donald Paradis, I possessed no medical

training."); *Elliot Affidavit*, at ¶ 52 (Docket No. 145-2) ("I have no training in

forensic pathology whatsoever.").  As a result, the Court concludes that Paradis has

shown insufficient evidence that a conspiracy to fabricate jurisdiction existed at

**MEMORANDUM ORDER  -  27**

this stage of the proceedings.

In any event, even if Paradis had shown evidence of a conspiracy during this time period,  Haws has brought forward sufficient evidence showing that his actions were covered by absolute immunity because he was engaged in quasi-judicial functions of preparing the affidavit and complaint and preparing witness Elliot for his hearing testimony during this time period.  Haws has declared that he most likely met with Elliot to prepare him for the hearing.  *Haws Affidavit*, ¶ 21 (Docket No. 138-4).  Elliot likewise states that he spoke to Haws prior to the preliminary hearing about what his testimony would be.  *Elliot Affidavit*, ¶ 45 (Docket No. 145-2).  There is no evidence regarding a meeting other than for hearing and testimony preparation.  The fact that these meetings took place less than 24 hours prior to the Arrest Warrant Hearing also supports a finding of absolute immunity for trial and witness preparation for Haws.

As to Elliot, absolute witness immunity cannot be defeated by alleging a conspiracy to present false testimony at trial, where the conspiratorial behavior is inextricably tied to the witness' testimony, as here.  *See Franklin v. Terr*, 201 F.3d 1098, 1102 (9th Cir. 2000).

**E.     Pre-Preliminary Hearing Conspiracy - Haws and Elliot**

The Court previously limited Defendants' potential liability to a pre-arrest

conspiracy.  However, the Court has determined that the potential scope of time and events covered by absolute immunity is narrower than previously thought based on a review of evidence provided with the parties' briefing and a closer look at the Ninth Circuit's *Genzler* case.  Particularly, the time period between the Arrest Warrant Hearing on June 25, 1980, and the Preliminary Hearing on December 10, 1980, is also open to the argument that Haws performed investigatory, not prosecutorial, work, as in *Genzler*.

Paradis has provided a transcript from a state court post-conviction hearing showing that Haws had a telephone conversation with Dr. Brady in which he first learned about the aspiration of water theory in late June or early July 1980.  *See Paradis' Counterstatement of Facts*, Exhibit 19, at pp. 1 & 3-4 (Docket No. 169-8).  This conversation occurred after the Arrest Warrant Hearing on June 25, 1980, but well ahead of the Preliminary Hearing on December 10, 1980.

Haws believes he discussed the aspiration of water theory with Elliot.  *Id.* Elliot has also previously testified that he called Dr. Brady to ask him about whether it was possible for water to have entered Palmer's lungs after her strangulation, and Elliot asserts that Dr. Brady had no answer to that question for him.  *Elliot Affidavit*, at ¶ 61 (Docket No. 145).  Elliot's recollection of having discussed these theories with Haws and Brady provide some evidence to support an

**MEMORANDUM ORDER - 29**

inference that a conspiracy could have existed.

The call between Brady and Haws, as well as the discussion between Haws and Elliot appear to have been investigatory in nature, and the timing was not close to an upcoming hearing.  These facts are much like those in *Genzler*.  Defendant Haws has not borne his burden to show that these discussions were a prosecutorial function.

Based on the foregoing, the Court concludes that Paradis may proceed on his claim against Haws and Elliot that Defendants Haws, Elliot, and Brady developed the aspiration of water theory to support Idaho jurisdiction and entered into a conspiracy in late June or early July 1980.  Haws has not shown that he was performing a quasi-judicial function and thus is not entitled to absolute immunity.  Neither has Haws or Elliot shown entitlement to qualified immunity during this time period, given that there is a genuine issue of material fact as to whether they entered into a conspiracy with Brady as to the aspiration of water theory during an investigatory stage of the case.  Therefore, Paradis may proceed on this claim for the time period of June 25, 1980, to December 10, 1980 against Haws and Elliot.  Elliot is not entitled to absolute witness immunity regarding the conspiracy because the content of Dr. Brady's medical expert testimony is not inextricably tied to Elliot's own testimony related to investigation of the scene.  Dr. Brady,

however, is entitled to absolute witness immunity, because the conspiracy is

inextricably tied to Brady's medical expert testimony as explained below.

## F.     False Procurement of an Arrest Warrant - Elliot

The constitutional validity of an arrest, or of an officer's actions in seeking

an arrest warrant, depends upon whether the officers had probable cause, or, in

other words, "whether at that moment the facts and circumstances within their

knowledge and of which they had reasonably trustworthy information were

sufficient to warrant a prudent man in believing that the petitioner had committed .

. .  an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).   In *Brinegar v. U.S.*, 338

U.S. 160 (1949), the Court explained the reasoning behind the "probable cause"

standard:

> Because many situations which confront officers in the course
> of executing their duties are more or less ambiguous, room must be
> allowed for some mistakes on their part.  But the mistakes must be
> those of reasonable men, acting on facts leading sensibly to their
> conclusions of probability.  The rule of probable cause is a practical,
> nontechnical conception affording the best compromise that has been
> found for accommodating these often opposing interests.  Requiring
> more would unduly hamper law enforcement.  To allow less would be
> to leave law-abiding citizens at the mercy of the officers' whim or
> caprice.

*Id*. at 176.

Similarly, in *Maryland v. Pringle*, 540 U.S. 366 (2003), the Court noted:

As early as *Locke v. United States*, 7 Cranch 339, 348, 3 L.Ed. 364

**MEMORANDUM ORDER  -  31**

(1813), Chief Justice Marshall observed, in a closely related context:
"[T]he term 'probable cause,' according to its usual acceptation,
means less than evidence which would justify condemnation . . . .  It
imports a seizure made under circumstances which warrant
suspicion."  More recently, we said that 'the quanta ... of proof'
appropriate in ordinary judicial proceedings are inapplicable to the
decision to issue a warrant.  *Brinegar*, 338 U.S., at 173, 69 S.Ct. 1302.
Finely tuned standards such as proof beyond a reasonable doubt or by
a preponderance of the evidence, useful in formal trials, have no place
in the [probable-cause] decision."  462 U.S., at 235, 103 S.Ct. 2317.

*Id*. at 371.

Where the plaintiff has alleged that the complaining witness offered

misleading evidence to the magistrate judge that caused the magistrate to wrongly

find probable cause and issue an arrest warrant, the court uses the test set forth in

*Franks v. Delaware*, 438 U.S. 154 (1978),[2] to determine the objective

reasonableness of the complaining witness' actions:

[A] plaintiff can only survive summary judgment on a defense claim
of qualified immunity if the plaintiff can both establish a substantial
showing of a deliberate falsehood or reckless disregard and establish
that, without the dishonestly included or omitted information, the
magistrate would not have issued the warrant.  Put another way, the

_____

[2]  Under *Franks v. Delaware*, a defendant in a criminal case may obtain an
evidentiary hearing by making a substantial showing that a police officer, either
knowingly or with reckless disregard for the truth, included a false statement in a search
warrant affidavit, and that the allegedly false statement was necessary to the finding of
probable cause. 438 U.S. at 155-56.  If the defendant proves the allegations by a
preponderance of the evidence at the evidentiary hearing, the defendant has established a
Fourth Amendment violation and the evidence obtained through the warrant must be
suppressed.  *Id*. at 156.

MEMORANDUM ORDER -  32

plaintiff must establish that the remaining information in the affidavit is insufficient to establish probable cause.  The showing necessary to get to a jury in a section 1983 action is the same as the showing necessary to get to an evidentiary hearing under *Frank*s.

*Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995).

In *United States v. Stanert*, 762 F.2d 775 (9th Cir. 1985), *as amended*, 769 F.2d 1410 (9th Cir. 1985), the court held that a Fourth Amendment challenge may proceed on allegations that a "warrant affidavit valid on its face . . . contains deliberate or reckless omissions of facts that tend to mislead."  762 F.2d at 781.  "By reporting less than the total story," the Court explained, "an affiant can manipulate the inferences a magistrate will draw."  *Id*.

A person contesting the content of a warrant on Fourth Amendment grounds is not required to provide "[c]lear proof of deliberate or reckless omission," but must only  "make a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit [or at hearing] from being misleading."  *Id*.   "'Intent to mislead' [the magistrate judge] is not an extra element that [a plaintiff] must show in order to survive summary judgment on qualified immunity"; rather, "*Hervey* . . .  turned on objective reasonableness, as do all issues of qualified immunity."  *Lombardi v. City of El*

*Cajon*, 117 F.3d 1117, 1122, 1125 (9th Cir. 1997).[3]

Finally, the Ninth Circuit has noted, "[a]lthough we are mindful that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, . . . we also recognize that sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Stanert*, 762 F.2d at 782 (internal citation and punctuation omitted).

In the civil rights qualified immunity context, once a plaintiff makes a substantial showing of intentional or reckless omission of facts, the court determines whether the addition of the facts would have caused the magistrate to refuse to issue the warrant. *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995) (rejecting the suggestion that materiality of the facts to the magistrate's decision to issue the warrant in a qualified immunity context is a jury question). If the court determines that plaintiff has met the two-pronged *Hervey* test, the claim may proceed to trial, where the plaintiff is left to convince a jury that the officer, in fact, made deliberate or reckless omissions. *Id*. at 791.

---

[3] Although the immunity issues in this case are being decided on summary judgment rather than summary dismissal, the court notes that the Ninth Circuit's earlier adoption of a "heightened pleading standard" for constitutional torts to survive dismissal, *see Branch v. Tunnell*, 937 F.2d 1382 (9th Cir. 1991), was disavowed in *Galbraith v. City of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

**MEMORANDUM ORDER -  34**

Here, Paradis must make a substantial showing that Elliot testified in a deliberately false manner or with reckless disregard for the truth. Paradis argues that it must have been clear to Elliot that Palmer was dead before she passed over the fence, rendering the running-down-the-hill theory implausible, and that Elliot knew that jurisdiction was one of the primary issues at the Arrest Warrant Hearing. Paradis' argument assumes that it is certain that (1) the labial tear occurred at the same time that the jeans tore, (2) the lack of a vital reaction means that she was dead at the time of the injury, (3) Haws and Elliot understood the significance of the labial wound with no vital reaction, and (4) the witness testimony placing Paradis and his companions at the scene for twenty to thirty minutes was accurate and excluded Palmer's death at an earlier time in Idaho.

The Court first considers whether Paradis has met the first prong of the *Hervey/Franks* test, that is, whether he has made a substantial showing that Elliot deliberately lied about or recklessly disregarded the information that the labial tear had no vital reaction. As shown above, Paradis has not come forward with evidence showing that Elliot knew or should have known of the significance of the labial wound. The only evidence in the record is that Elliot was unaware of the significance of this information in the autopsy report and that he had no medical training to be able to understand it. Without an understanding of the significance

of this information, he would have had no reason to either provide the autopsy report to the magistrate or to hide it from her.  Under these circumstances, the Court concludes that Paradis has not met the first prong of the *Hervey/Franks* test.

Further, even if Elliot had the autopsy report and deliberately or recklessly failed to provide it to magistrate, Paradis has not shown that the magistrate would not have issued the arrest warrant had she been given the report.  Therefore, Paradis' claim fails on the second prong of *Hervey/Franks*, as well.

To apply the second prong of the test, the Court reviews the actual evidence presented at the hearing and determines whether the omitted evidence would have made a material difference.  It is easy to look at this case from hindsight with multiple experts' opinions in hand and argue that it was clear that there was no jurisdiction in Idaho, but explanatory expert opinions were not available to Elliot and Haws at the probable cause determination stage of this action.  Dr. Brady did not hold the opinion about Palmer aspirating water at the time he autopsied her body.  *Plaintiff's Response to Brady's Statement of Facts*, at ¶ 9 (Docket No. 173-8).  Haws and Elliot did not present any aspiration of water theory at the Arrest Warrant Hearing.  Rather, Haws and Elliot relied on the circumstantial evidence that had been collected by investigators and upon Elliot's understanding of Dr. Brady's opinion at that point in time.

At the warrant hearing on June 25, 1980, approximately 72 hours after the

bodies had been found, Elliot provided the following information to the magistrate:

(1) Kimberly Palmer's body was found face down in a stream; (2) witness

Roseanna Moline saw Kimberly Palmer alive in the front room of Paradis'

Spokane home in the early morning of June 21; (3) Palmer had some abrasions on

her chest and legs, the majority of which Dr. Brady thought had occurred after

death; (4) Palmer was found naked from the waist up, and the front part of her

jeans had been ripped open and partially torn, and her left buttock was exposed

where the jeans had been ripped or torn on something; (5) a white female tank top

was in her hand or hooked around her arm; (6) Dr. Brady thought the death was

caused by strangulation, and definitely not by drowning; (7) Scott Currier's body

was found 25 feet from the road, wrapped in a sleeping bag, while Palmer's body

was found 85 feet from the road, which included a barbed wire fence as an obstacle

laying between the road and the place where her body was found; and (8) the rips

in the back of the jeans were consistent with possibility of her tearing the jeans on

the fence, but the front appeared to have been ripped by an unknown person.[4]

---

[4] Other evidence considered by Haws to aid him in his decision to file the
Complaint but not necessarily presented at the Warrant Hearing include: (1) Palmer's
body matched the contours of the land where she was found; (2) her body showed no
signs of torture like Currier's body; (3) her body showed less decomposition than
Currier's body; (4) superficial scrapings on Palmer's chest suggesting she slid under the
fence; (5) evidence at the crime scene that Currier's body had been dragged to the

There are numerous passages in the Arrest Warrant Hearing Transcript that show Detective Elliot made clear to the magistrate that he was unsure of the facts of the case, but he had formed a theory based on the circumstantial evidence that he knew and found significant:

| Q (by Haws): | Do you have any other reason to believe that the female . . . the body of the female was not drug down to the creek? |
|---|---|
| A (by Elliot): | *I can't say that it wasn't* because of the . . . due to the rain obliterating any tracks or anything else. |

*Paradis' Counterstatement of Facts,* Exhibit 11 (Arrest Warrant Hearing Transcript), at p. 24 (Docket No. 169-5).

| Q (by Judge): | So you don't know how Miss Palmer got from Spokane to the place where her body was found? |
|---|---|
| A (by Elliot): | We're assuming that she was in the Volkswagen, yes. |
| Q (by Judge): | O.K. *But you don't. . .* |
| *A (by Elliot):* | *We're not. . .* |
| Q (by Judge): | . . . have any evidence or any indication of that. |
| A (by Elliot): | That's the only vehicle that had been up and down that road. |

---

location where it was found, and none showing Palmer was dragged; (6) the cause of death was different; and (7) the difficulty of carrying a body 80 feet down steep terrain. *Addendum*, at pp. 2-3 (Docket No. 165).

**MEMORANDUM ORDER - 38**

*Id.* at pp. 25-26 (emphasis added).

| | |
|---|---|
| Q (by Judge): | Do you believe that she was alive at the time that she arrived in the Post Falls area? |
| A (by Elliot): | *I can't answer that.*  According to the medical examiner, due to the loss of body fluids and stuff, it was pretty hard to determine the time of death; so. . . |

*Id.* at p. 27 (emphasis added).

| | |
|---|---|
| Q (by Judge): | Well, Mr. Haws went into whether or not her body was carried down the hill or whatever.  Do you have reason to believe that perhaps she walked down it as opposed to being drug down it or . . . |
| A (by Elliot): | She could've been alive when she arrived there and jumped out of this vehicle, and run down there and hit that fence, and went over the fence, they caught up with her, and then could have strangled her down there and throwed her in the river. |
| Q (by Judge): | Would the tear on the front of her jeans be consistent with her having run into the fence (inaudible - Detective Elliot taking), or something else? |
| A (by Elliot): | No.  I believe that possibly that they were going to sexually assault her.  From my experience and that, that's the way . . . Levi's, they're pretty hard to tear, but the . . . that's. . . |
| Q (by Judge): | Is it your believe that this is how the fence post became . . . |
| A (by Elliot): | It was dark, she ran down there and hit that post.  it was quite rotten, it wouldn't have took much. |
| Q (by Judge): | So it is more or less your belief that she was alive at the |

> time she arrived there – not particularly from anything but physical evidence that indicates . . .
>
> A (by Elliot):  *It's possible that she might have. . .* they brought her over and had her in this other sleeping bag that we found at the scene thinking she was dead; and when they unloaded the other body is when she came-to enough to run away from them.

*Id.* at p. 12-13 (emphasis added).

These passages indicate that Detective Elliot plainly admitted that he did not know the time or place of death, and that the coroner had not been able to pinpoint a time of death.   The omitted evidence is the coroner's report of the information that Palmer had a large labial wound with no vital reaction.  This information would have provided the magistrate judge with more circumstantial evidence tending to show that Palmer was dead when her body encountered the barbed wire fence; however, at the 72-hour-mark, this evidence, in light of the other circumstantial evidence, was not enough to show that Palmer died in a state other than Idaho.

There is nothing in the autopsy report showing that Dr. Brady had attributed significance to the labial would, as he performed no microscopic testing on the wound area and did not use the fact to draw any conclusion in the report.  The autopsy report does not elaborate on the wound as significant to the time of death.  In addition, investigators had not matched up the ripped jeans to the wound.

**MEMORANDUM ORDER -  40**

*Plaintiff's Counterstatement of Facts*, Exhibit 3, at p. 29 (Docket No. 169-2).

Even if the evidence of the labial wound had been presented, there is nothing in the record to show that the magistrate would have thought that the nonreactivity of the labial wound would have negated probable cause given the other evidence presented. Paradis' argument presupposes that the detective, prosecutor, and magistrate judge should have been able to pinpoint at that early stage of the proceedings what the autopsy doctor and other later expert witnesses could not – the time of Palmer's death. If the autopsy doctor did not believe he had enough information to include the time of death in his report, medical laypersons cannot be held to a standard requiring them to do so at a probable cause hearing. Rather, they were entitled to rely on other circumstantial evidence to meet the probable cause standard.

For example, at the hearing, there was discussion about the fact that the heavy rain had washed away much of the evidence, and the rain could have washed away the blood from the jeans. It was only after expert testing much later in the proceedings that it was determined that there had been no blood on Palmer's jeans. The technology to do "luminol testing" to show that no blood was on the jeans had not even been developed at the time of Paradis' trial. Elliott admits to not having seen blood on the jeans at the time of the autopsy, but, again, there was the factor

of the heavy rain.

Similarly, Paradis' argument would have required Elliot to know the amount of time it takes a body to stop producing a blood reaction to a tearing of the flesh and to relate that to the witness sightings of the suspects in the area, which occurred twenty to thirty minutes apart.  Elliot has stated that he did not attribute any relevance to the exact time between the sightings, and that, in his experience, witnesses' descriptions of the timing of an event is often inaccurate.  *Elliot Affidavit*, at ¶¶ 54-55.

At the probable cause hearing, the issue was not simply whether Palmer was probably killed at Mellick Road, but whether she was probably killed in Idaho. Detectives had found no evidence linking Palmer's murder to Paradis' Spokane house where Currier was beaten.  *See Affidavit of Jim Hansen*, at p. 5 (Docket No. 145).  Even today, there has been no conclusive showing that Palmer was not murdered in Idaho.  Viewing Paradis' criminal case at its end, the federal habeas corpus court specifically noted: "The Court does not conclude, however, that the circumstantial evidence given at trial and/or the weight to be given to the credibility of witnesses is conclusively contradicted by the notes or the testimony given at the evidentiary hearing or that a reasonable juror would necessarily find the petitioner not guilty of having killed Palmer in Idaho." *Paradis v. Arave*,

CV95-446-S-EJL, Order of March 14, 2000 (Docket No. 109).

The law is clear that a showing of probable cause is not based upon a preponderance of evidence or guilty beyond a reasonable doubt standard. *Maryland v. Pringle*, 540 U.S. at 371.  Further, the Idaho Criminal Rules requires "substantial evidence," at the arrest warrant hearing stage, not a higher showing of "substantial evidence *upon every material element of the offense charged*" that is required at the preliminary hearing.  *See* Idaho Criminal Rules 4(e) & 5.1(b) (emphasis added).

In *Lombardi*, the court reasoned:

> [P]articularly where omissions are involved, materiality may not have been clear at the time the officer decided what to include in, and what to exclude from, the affidavit.  In such cases, when it is not plain that a neutral magistrate would not have issued the warrant, the shield of qualified immunity should not be lost, because a reasonably well-trained officer would not have known that the misstatement or omission would have any effect on issuing the warrant.

117 F.3d at 1126.

The evidence Elliot presented at the hearing met the probable cause standard.  Paradis has not shown that the omitted evidence would have resulted in a different outcome under the totality of the circumstances known 72 hours after the bodies were found.  The Court also notes that other omitted evidence known to Haws and Elliot would have weighed in favor of a finding of probable cause.  *See*

**MEMORANDUM ORDER  -  43**

Footnote 5, *supra*. As a result of the foregoing, the Court concludes that Elliot is entitled to qualified immunity and summary judgment on Count VI, the § 1983 false procurement of an arrest warrant claim.

**G.    State Law Claims**

    1.    Negligent Infliction of Emotional Distress - Haws

Count X of Paradis' Amended Complaint asserts a claim of "negligence and intentional infliction of emotional distress." The Court previously determined that there is no state law negligent investigation claim in Idaho. *See Order dated September 30, 2004*, at pp. 35-36 (Docket No. 92).  It is unclear whether Paradis is attempting to assert a claim of negligent infliction of emotional distress.  If so, Defendant Haws asserts that it is covered by common law immunity if the allegations arise during a time when he was functioning as a prosecutor rather than an investigator. *See id.* at p. 46.  Because it appears that there is a question as to whether there was  pre-prosecution conspiracy arising during the time period specified above, the Court will allow this claim to proceed as to that time period only.

The Court treats the intentional infliction of emotional distress claim as a motion for reconsideration below with Dr. Brady's Motions.

    2.    False Light Invasion of Privacy - Haws

Paradis has also asserted a state law false light invasion of privacy claim (Count IX).  This claim was not asserted in Paradis' ITCA Notice of Claim, and it is also barred by the statute of limitations; therefore, he cannot pursue such a claim here.  This claim is subject to summary dismissal or summary judgment.  *See Order dated September 30, 2004*, at pp. 36-41 (similar context of defamation).  Because Paradis has in his possession everything needed to rebut an ITCA Notice and statute of limitations defense, he is not prejudiced by the Court determining this claim at the immunity summary judgment motion stage.

    3.    <u>Malicious Prosecution under § 1983 - Elliot</u>

The Court previously left open the question of whether a § 1983 malicious prosecution claim would require a showing of actual innocence because Paradis' Complaint did not contain such a claim.  Paradis has amended his Complaint to include a "§ 1983 malicious prosecution claim" (Count IV).  In *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1068 (9th Cir. 2004), the Court used California malicious prosecution elements to characterize the elements of such a claim; among those elements was one of favorable termination of the prior action.  There, the Court explained:

> When such a dismissal is procured as the result of a motion by the prosecutor and there are allegations that the prior proceedings were instituted as the result of fraudulent conduct, a malicious prosecution plaintiff is not precluded from maintaining his action unless the

defendants can establish that *the charges were withdrawn on the basis of a compromise among the parties* or for a cause that was not inconsistent with his guilt.

*Id* (emphasis added).

Using that structure as a model in this case, the Court concludes that Paradis is not entitled to assert such a claim, since he entered into a compromise,[5] and Idaho law has a favorable termination requirement that does not include compromise as a "favorable termination."  *See Myers v. City of Pocatello*, 559 P.2d 1136 (Idaho 1977); *Campbell v. Bank & Trust Co.*, 166 P. 258 (Idaho 1917).  This claim fails to meet the first prong of *Saucier*, 533 U.S. at 201, because Paradis has not shown that, under the existing facts, Elliot's conduct violated Paradis' constitutional rights.  Therefore, Elliot is entitled to summary judgment.

4.    Section 1983 Conspiracy to Withhold Evidence - Elliot

Paradis has alleged that Elliot and Brady entered into a conspiracy wherein Dr. Brady would not bring documents and tissue and fluid samples from the autopsy of Palmer to the trial (Count XI).  *Amended Complaint*, at ¶ 200 (Docket No. 122).  However, Paradis admits that he has no evidence at this point to tie

---

[5] Paradis was not found innocent of the death of Kimberly Palmer in Idaho in his habeas corpus proceedings through which he won release.  After habeas corpus relief was granted, Paradis entered into an agreement with the State wherein he pled guilt to accessory after the fact to Palmer's murder in exchange for a dismissal of all homicide charges. *See Original Complaint*, at ¶ 24 (Docket No. 1); *Haws' Answer*, Exhibit "Plea and Sentencing Agreement," at pp. 29-31 (Docket No. 24).

MEMORANDUM ORDER  -  46

Elliot to any conspiracy to withhold evidence.  He argues that the lack of evidence

should not factor into the Court's qualified immunity analysis.  However, Paradis

was provided with an opportunity to conduct discovery on this very issue to obtain

the evidence needed to respond to the qualified immunity defense.  Therefore, the

Court rejects Paradis' argument that he does not have to bring forward facts

showing that Elliot was involved in a conspiracy to withhold evidence.

The Ninth Circuit has recently clarified that, in the context of a summary

judgment motion, the district court must follow the analytical framework of Rule

56 when defendants asserting qualified immunity have challenged the truth of the

facts alleged in the Complaint:

> [I]f a defendant moving for summary judgment has produced
> enough evidence to require the plaintiff to go beyond his or her
> pleadings, the plaintiff must counter by producing evidence of his or
> her own.  If in that circumstance the plaintiff fails to produce
> evidence, the district court is not required (or even allowed) to assume
> that the challenged factual allegations in the plaintiff's complaint are
> true.  Similarly, if in that circumstance the plaintiff produces evidence
> that is not enough, by itself, to create a genuine issue of material fact,
> the district court is not required (or even allowed) to assume the truth
> of challenged allegations in the complaint in order to supplement that
> evidence.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24
> (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160-61 (1970);
> *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc*., 210 F.3d
> 1099, 1102-03 (9th Cir. 2000).  If discovery has been curtailed by the
> district court because the defendant has asserted official immunity
> from suit, the district court may to some extent relax the evidentiary
> standards for the plaintiff in recognition of the restrictions on
> discovery, but the requirement that the plaintiff produce evidence

MEMORANDUM ORDER - 47

nonetheless remains.  *See DiMartini v. Ferrin*, 889 F.2d 922, 926-27 (9th Cir. 1989).

*Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004).

Similarly, in *Paine v. City of Lompoc*, the Court explained:

Determining whether Ast and Tietjen did participate in such a conspiracy cannot be left until trial, as the district court believed. As we explained in *Cunningham*, "in resolving a motion for summary judgment based on qualified immunity, a court must carefully examine the specific factual allegations against each individual defendant."  229 F.3d at 1287.  There is no material difference between an order denying a motion for summary judgment based on qualified immunity and an order denying a motion based on absolute immunity that would favor a different analysis here. Furthermore, quite aside from the special concerns regarding the need for early resolution of matters concerning immunity (see, e.g. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2155-56, 150 L.Ed.2d 272 (2001)), litigants are ordinarily entitled to resolution of their summary judgment motions through a determination whether there are material facts in dispute regarding the elements necessary to establish liability. Whether or not each defendant was a participant in the incidents that could give rise to liability is certainly such an element.  So if a plaintiff cannot in its summary judgment motion factual submissions connect any particular defendant to the incidents giving rise to liability, that defendant is entitled to summary judgment and may not be required to go to trial.

265 F.3d at 985.

Here, because Paradis has no such facts that would implicate Elliot in a

conspiracy with Defendant Brady to withhold evidence, his claim fails under the

reasoning of *Butler* and *Paine*.

In addition, Paradis' Count XI also fails the first prong of the *Saucier* test,

**MEMORANDUM ORDER  -  48**

533 U.S. at 201, because Paradis has failed to bring forward any evidence to show that, if there were such an agreement, there was an actual deprivation of constitutional rights resulting from that agreement.  *See Ting v. U.S.*, 927 F.2d at 1512.  Paradis has asserted that the withholding of the Palmer lung tissue slides violated his Sixth Amendment right to obtain exculpatory evidence.  However, at the same time, Paradis has submitted the Affidavits of two doctors stating that the presence or absence of plankton in the lungs is irrelevant to a determination of whether someone died before or after being placed in water.  *Affidavit of Kris L. Sperry, M.D.*, at ¶¶ 22-24 (Docket No. 173-5); *Affidavit of Todd C. Grey, M.D.*, at ¶ 11 (Docket No. 173-5).  Therefore, Paradis has also failed to show that the evidence is exculpatory, and, hence, caused a violation of his Sixth Amendment right.  As a result, Elliot is also entitled to summary judgment on the first prong of *Saucier,* whether the facts alleged, viewed in a light most favorable to the plaintiff, show that the defendant's conduct violated the plaintiff's constitutional rights.  *See* 533 U.S. at 201.

## VI.

## WALKERS AND ERBLAND'S MOTION FOR SUMMARY JUDGMENT (Docket No. 152)

### A.   Defendant Walker

MEMORANDUM ORDER  -   49

Glen Walker was the Kootenai County Prosecutor at the time of the Paradis investigation and trial.  Paradis has conceded that he has no evidence that Walker was involved in any aspect of the Paradis case such that civil liability would attach. *Paradis' Opposition*, at p. 11 (Docket No. 171-1).  Therefore, summary judgment on all claims against Walker in his individual capacity shall be granted.

## B.   Defendant Erbland

Peter Erbland was second chair counsel in the Paradis case and in the Gibson case in 1981.  Erbland prepared for and appeared as lead counsel in the Paradis Preliminary Hearing on December 10, 1980.  In 1987, having left the Kootenai County Prosecutor's Office, Erbland helped prosecute the Evans trial as a State of Idaho Assistant Attorney General.

Paradis has one current claim and three proposed amended claims against Erbland: (1) a § 1983 Fourth or Fourteenth Amendment claim that Erbland participated in a pretrial conspiracy to fabricate or suppress evidence to support the State's position that Kimberly Palmer was killed in Idaho, providing grounds for jurisdiction (Amended Complaint, Claim V); (2) a § 1983 Fourth or Fourteenth Amendment claim that Erbland participated in a post-trial conspiracy to suppress the same evidence that could have exonerated Paradis in the criminal case (proposed second amended complaint); (3) a state law false light claim (proposed

second amended complaint); and (4) a state law intentional infliction of emotional distress claim (proposed second amended complaint).

    1.    Conspiracy Pre-Arrest and Pre-Preliminary Hearing

    There is no evidence in the record that Erbland had anything to do with the Paradis case prior to the time he began preparing for the Preliminary Hearing of December 1980.  Haws had been handling the case without Erbland's involvement, but was in a jury trial at the time of the Preliminary Hearing.  *Erbland Statement of Facts*, at ¶ 4 (Docket No. 152-2).  Thus, Erbland was assigned to handle the preliminary hearing.  While preparing for the preliminary hearing, Erbland's office assistant "contacted Dr. Brady's office who filled in the blanks on the form affidavit as to cause of death."  *Erbland Affidavit*, at ¶ 9 (Docket No. 152-3). Once Erbland began this preparation for the preliminary hearing – which was his first involvement in the case – he was absolutely immune from any claims of conspiracy.

    Haws states that he told Erbland about the aspiration of water theory, but the time period of that conversation is unknown.  There is no evidence that Erbland had any personal contact with Brady or with Detective Elliot about Dr. Brady's

theories during the time period before the Preliminary Hearing.  *Id*. at ¶¶  8-9.[6]

Erbland has declared that Haws handled all of the forensic medical witnesses and

evidence at the trials of Gibson and Paradis, including consultation and preparation

of Dr. Brady as an expert witness.  *Erbland Affidavit*, at ¶ 13 (Docket No. 152-3).

Because there is no evidence that Erbland did any investigative or police-type work

regarding Dr. Brady's theories, and the only evidence is that Haws spoke to

Erbland about Dr. Brady's aspiration theory, the Court concludes that one

prosecutor speaking to another about the case is a prosecutorial function that is

covered by absolute immunity.  Therefore, Erbland is entitled to summary

judgment on Paradis' conspiracy claim at both the pre-arrest and pre-Preliminary

Hearing stages.

### 2.    Post-Trial Conspiracy

Paradis has also alleged that Erbland is part of a post-trial conspiracy, and

that he should be allowed to amend his Complaint to assert such a cause of action.

Paradis' reliance on *Houston v. Partee*, 978 F.2d 362, 367 (7th Cir. 1992), to

---

[6] The following are undisputed facts: "Peter Erbland had a brief conversation with George Elliot sometime after the autopsy of Kimberly Palmer regarding Elliot's observations during the autopsy.  However, this conversation was brief and limited to Elliot's general observations of what he saw and experienced during that autopsy.  At no time did Elliot ever communicate to Erbland any findings, statements, opinions, or observations by Dr. Brady during Kimberly Palmer's autopsy."  *Erbland Statement of Facts*, at ¶ 5 (Docket No. 152-2); *Plaintiff's Counterstatement of Facts*, at ¶ 5 (Docket No. 171-1).

support his theory that Erbland was involved in a post-trial conspiracy is misplaced. *Houston v. Partee* stands for the proposition that prosecutors "who, after conviction of criminal defendant, acting solely as investigators, acquired and withheld exculpatory evidence after their role in the prosecution had ended are not entitled to any more immunity than the defendant police officers." *Broam*, 320 F.3d at 1031. In other words, prosecutors are not stripped of absolute immunity because they leave the employment of the prosecutor's office; rather, they are stripped of absolutely immunity and are entitled only to qualified immunity if they act "solely as investigators" . . . "after the conviction of a defendant." The critical test is whether an attorney was performing prosecutorial or investigative functions, not where he was employed at the time the *Brady* information was discovered.

Paradis has brought forward no evidence to show that Erbland ever acted "solely as an investigator," or that he was functioning as a police officer or detective. His response to the letter showing that he had the Haws Notes in his possession in November 1987 provides no such evidence. The Court concludes that allowing further amendment of the Amended Complaint to add a post-preliminary hearing conspiracy claim against Erbland would be futile.

### 3.     State Law False Light Claim

Paradis asserts that Erbland defamed Paradis and placed him in a false light

after Erbland had notice of the Haws Notes.  Paradis wants to amend the Complaint

to add this cause of action.  However, Paradis' ITCA Notice of Claim did not

include this cause of action, and therefore the claim is barred, and amendment

would be futile.  *See Paradis' Notice of Tort Claim*, attached to Haws' Brief in

support of Motion to Dismiss, at pp. 25-33 (Docket No.46).

In addition, this claim is time-barred because Paradis has not shown that the

alleged statements were made on or after April 9, 2001, two years prior to the

filing of the original Complaint in this case.  *See Order of September 30, 2004*, at

pp. 36-41 (Docket No. 91).

### 4. State Law Intentional Infliction of Emotional Distress

A  claim of intentional infliction of emotional distress includes the following

elements: (1) the conduct must be intentional or reckless; (2) the conduct must be

extreme and outrageous; (3) there must be a causal connection between the

wrongful conduct and the emotional distress; and (4) the emotional distress must

be severe.  *Payne v. Wallace*, 32 P.3d 695 (Idaho Ct. App. 2001); *Evans v. Twin

Falls County*, 796 P.2d 87, 97 (Idaho 1990).  Paradis asserts that Erbland's

withholding of the Haws Notes from approximately November 1996 constituted

intentional infliction of emotional distress.  However, because Paradis has failed to

show that Erbland was acting in an investigatory capacity rather than a quasi-

judicial capacity, Erbland is entitled to absolute immunity for that time period.  All

other time period in which Erbland would have been involved in the case, from the

Preliminary Hearing on, are covered by absolute immunity.  Therefore, amendment

on this point would be futile.

## VII.

## DR. BRADY'S MOTION FOR SUMMARY JUDGMENT (Docket No. 156) AND MOTION TO DISMISS (Docket No. 157)

Paradis' remaining claims against Dr. Brady are as follows:

| | |
|---|---|
| Count IV | a § 1983 malicious prosecution claim. |
| Count V | a § 1983 pre-arrest conspiracy to fabricate jurisdiction claim. |
| Count VIII | a state law intentional infliction of emotional distress. |
| Count IX | a state law false light invasion of privacy claim. |
| Count XI | a § 1983 claim that Brady was involved in a conspiracy with Detective Elliot to withhold exculpatory evidence in violation of the Sixth Amendment. |

*See Amended Complaint* (Docket No. 122).

## A.   Malicious Prosecution Claim under § 1983

As noted above with respect to this same claim asserted against Defendant

Elliot, Paradis' § 1983 claims fails because he entered into a compromise to

dispose of the Palmer homicide charges.  *See Awabdy*, 368 F.3d at 1068 ("plaintiff

is not precluded from maintaining his action unless the defendants can establish

that *the charges were withdrawn on the basis of a compromise among the parties*

or for a cause that was not inconsistent with his guilt) (emphasis added).

   The Court alternatively concludes that the reasoning of *Franklin v. Terr*

governs and would preclude such a claim.  There, the Court reasoned that the

plaintiff could not avoid absolute immunity simply by reframing a claim that the

witness presented false testimony into a claim based on the same facts but a

different legal theory.  The Court particularly explained:

>    We are persuaded that allowing a plaintiff to circumvent the
> *Briscoe* rule by alleging a conspiracy to present false testimony would
> undermine the purposes served by granting witnesses absolute
> immunity from damages liability under § 1983.  Absolute witness
> immunity is based on the policy of protecting the judicial process and
> is "necessary to assure that judges, advocates, and witnesses can
> perform their respective functions without harassment or intimidation.

201 F.3d at 1101.

   Therefore, Paradis may not reframe his conspiracy-to-present-false-

testimony claim alternatively as a § 1983 direct constitutional claim.  Dr. Brady is

entitled to summary judgment on this claim.

**B.     Conspiracy to Fabricate Jurisdiction Claim Prior to Arrest and
        Probable Cause Hearing**

   The Court previously determined that Dr. Brady, the Oregon physician who

performed the Palmer autopsy and who testified at trial for the State of Idaho, has

absolute immunity for his trial testimony and preparation.  Private witnesses have

absolute immunity at common law, and it is clear that § 1983 "does not authorize a

damages claim against private witnesses."  *Briscoe v. LaHue*, 460 U.S. 325, 335

(1983).  Witness immunity is extended for perjured testimony at trial and for "any

alleged conspiracy to commit perjury."  *Id.*

However, as noted above, "testimonial immunity does not encompass non-

testimonial acts such a fabricating evidence."  *Cunningham v. Gates*, 229 F.3d

1271, 1291 (9th Cir. 2000).  Examples of "acts of fabricating evidence" include:

(1)  "tampering with documentary or physical evidence,"  (2) "preventing

witnesses from coming forward," or (3) "suppressing the identities of other

potential witnesses."  *Paine v. City of Lompoc*, 265 F.3d 975, 982 (9th  Cir. 2001).

In *Franklin v. Terr*, 201 F.3d 1098 (9th Cir. 2000), the Ninth Circuit

determined that a plaintiff could not pierce the absolute immunity of a trial witness

by alleging that the witness engaged in a conspiracy to present false testimony.  In

particular, the Court noted:

> Franklin alleges that Terr [a psychiatrist/witness] conspired
> with Franklin-Lipsker [a therapist/witness] by interviewing her before
> Franklin's trial and by then incorporating information obtained from
> those interviews into her own testimony.  Franklin also alleges that
> Terr provided Franklin-Lipsker "with a description of the sort of
> details that would make her testimony more persuasive, which

**MEMORANDUM ORDER  -  57**

> Franklin-Lipsker then incorporated into her continually evolving 'recollection' of the Nason murder." The ostensible purpose of this conspiracy was to ensure that one person's testimony did not contradict the other's testimony, but because Terr's alleged conspiratorial behavior is inextricably tied to her testimony, we find that she is immune from damages.

*Id.* at 1102. The *Franklin* Court also explained that absolute immunity is proper

where the witness's "alleged conspiratorial behavior is inextricably tied to [the

witness's] testimony." *Id.*

Paradis' only allegations of wrongdoing against Brady related to this cause

of action are that he falsified his own testimony about the significance of the

autopsy findings. His alleged "fabrication of evidence" is solely related to his own

false testimony. The "fabrication of evidence" claims here are not of the nature of

those occurring in *Paine* and *Spurlock*, where (1) the fabricated evidence related to

other witnesses and documentary evidence not inextricably tied to the police

officer's testimony, and (2) the witnesses were fact witnesses rather than witnesses

giving expert opinion testimony. As a result, the Court concludes that the

allegations of conspiracy are inextricably tied to his court testimony, and any

conduct in conspiring to change his testimony is covered by *Franklin v. Terr*, 201

F.3d at 1102.

## C.  False Light Invasion of Privacy Claim

Paradis brings forward a December 2, 1994 *Day One* transcript, and a March

6, 1995, news video of the *Northwest Report*, to allege that Brady made statements placing him in a false light.  In order to meet the statute of limitations, the remarks would have to have been made on or after April 9, 2001, which is two years before the Complaint in this action was filed.  *See Idaho First National Bank v. Bliss Valley Foods*, 824 P.2d 841, 856 (Idaho 1991).  This claim is barred by the statute of limitations.

## D.      Section 1983 Conspiracy with a State Actor to Withhold Exculpatory Evidence

Paradis has admitted that he has no evidence to support his allegation that Elliot and Brady worked together to withhold the slides of Kimberly Palmer's lungs prior to trial.  As a result, Paradis' Count XI fails on the first prong of *Saucier*, 533 U.S. at 201.

Paradis' Count XI also fails the first prong of the *Saucier* test because Paradis has failed to bring forward any evidence to show that, if there were such an agreement, there was "an actual deprivation of those rights resulting from that agreement." *Ting v. U.S.*, 927 F.2d at 1512.  As explained above, Paradis' own experts state that the lung slide content is irrelevant to the issues on which Dr. Brady testified.  *Affidavit of Kris L. Sperry, M.D.*, at ¶¶ 22-24 (Docket No. 173-5); *Affidavit of Todd C. Grey, M.D.*, at ¶ 11 (Docket No. 173-5).  Therefore, Paradis has also failed to show that the evidence is exculpatory, and, hence, caused a

violation of his Sixth Amendment right.  As a result, for this reason, as well, Brady is entitled to summary judgment on the first prong of *Saucier*.

## VIII.

## HAWS' AND BRADY'S MOTION TO RECONSIDER INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ISSUES

Defendants Brady and Haws request that the Court reconsider the statute of limitations issue and enter a dismissal of the intentional infliction of emotional distress claim based on this defense.  After reviewing the Court's prior analysis and the new briefing of the parties, the Court declines to change its prior ruling that Paradis' intentional infliction claims are untimely.

The elements of the intentional infliction claim are: (1) the defendant must engage in conduct that is intentional or reckless; (2) the conduct must be extreme and outrageous; (3) the wrongful conduct must be the cause of the emotional distress; and (4) the resulting emotional distress must be severe.  *Curtis v. Firth*, 850 P.2d 749, 753 (Idaho 1993).

Paradis' intentional infliction of emotional distress claim arises from the following allegations.  For fifteen years, Defendants allegedly hid evidence of Paradis' innocence.  *Amended Complaint*, at ¶ 20 (Docket No. 122).  In January 1996, Paradis discovered Haws' handwritten notes, revealing evidence which allegedly contradicted the testimony of Dr. Brady.  *Id*. at ¶ 21.  In 1999 a hearing

was held in which the contradictions between the Haw's notes and Dr. Brady's trial testimony were exposed.  Subsequently, Paradis' conviction was set aside in March of 2000 when Judge Edward Lodge granted Paradis' federal habeas corpus petition.  *See Paradis v. Arave*, CV95-446-S-EJL.  The Ninth Circuit Court of Appeals affirmed the granting of the habeas petition in March of 2001.  On April 10, 2001, the Kootenai County Attorney dismissed the homicide charges against Paradis in a plea agreement, and Paradis was released from incarceration. *Amended Complaint,* at ¶ 25-27 (Docket No. 122).

Defendant Haws and Brady allegedly engaged in outrageous conduct when they deliberately conspired to produce false evidence against Paradis in order to convict him.  Paradis also alleges that Haws and Brady continued to engage in a pattern of conduct to hide and keep secret the actual forensic facts about Palmer's death.  *Id*. at ¶¶ 160, 165-66, & 188-190.  Paradis allegedly suffered physical deterioration and injury, severe emotional distress, and economic harm as a result of Defendant's actions.  *Id*. at ¶ 168-70.

The Court previously determined that Paradis' intentional infliction of emotional distress claim accrued at the time of his release from incarceration, April 10, 2001.  Paradis filed his Complaint on April 9, 2003.  Therefore, the Court held that the state tort claim was timely filed.  *Order of September 30, 2004*, at p. 45

(Docket No. 92).  The Court relied upon the Idaho Supreme Court case of *Curtis v.*
*Firth*, 850 P.2d 749, 755 (Idaho 1993), for its determination that Paradis had timely
filed the intentional infliction of emotional distress claim.  The *Curtis* case held
that a claim of intentional infliction of emotional distress is a continuing tort for
purposes of the statute of limitations.  *Id*. at 755 (a tort involving continuing injury
accrues at the time the tortious conduct ceases).

The alleged extreme and outrageous nature of Defendants' conduct gained
legal significance only after the murder charges were dismissed against Paradis.
The damage flowing from the allegedly fabricated evidence accrued only when the
courts established that the contradictory testimony of Brady and the undisclosed
notes from Haws were considered exculpatory.  If Paradis had tried to bring an
emotional distress claim against Defendants Brady and Haws prior to the time the
murder charges were dismissed, there would have been no basis upon which to
establish the elements of the intentional infliction claim.[7]  Defendants provide no
authority for the proposition that the extreme and outrageous conduct cannot be
defined in light of events that occur later in time, such as after Paradis' writ of

---

[7] The analogous statute of limitations issue was examined in *Venegas v. Wagner*,
704 F.2d 1144, 1146 (9th Cir. 1983) where a plaintiff alleged "conduct tainting or
distorting the integrity of the truth finding process," thereby denying him a fair trial and
resulting in his conviction of the criminal charges.  The Ninth Circuit found that the cause
of action did not accrue until the plaintiff's actual release date from prison.  *Id*.

**MEMORANDUM ORDER  -  62**

habeas corpus was granted and his criminal charges were dismissed.  Accordingly, the Court will not change its ruling on the accrual issue of Defendants' statute of limitations defense.

Paradis' allegations against Brady focus on his alleged duty to provide truthful, accurate scientific evidence, and the allegations against Haws focus on his duty to refrain from fabrication of evidence;  Paradis charges both with violating their duties throughout the time Paradis is imprisoned.  Although Paradis' facts present a novel theory of intentional infliction of emotional distress, Haws and Brady have come forward with no case law proscribing the theory.

However, as to Haws, the intentional infliction claim is barred by absolute immunity during  Haws' trial preparation and participation.  The time period after trial is covered by absolute prosecutorial immunity for Haws because there is no evidence that he was conducting investigatory work after Paradis' trial.[8]  However, absolute immunity is not broad enough to cover the investigatory portion of Paradis' claim against Haws from late June or early July 1980 to December 10,

---

[8] *See Kerr v. Lyford*, 171 F.3d 330, 336 (5th Cir. 1999), *overruled on other grounds by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) (upholding finding of absolute immunity for special prosecutor who was sued after criminal charges were dismissed against the plaintiffs); *In Re Lickman*, 304 B. R. 897, 902 n. 3 (M.D. Fla. 2004) (holding that judicial immunity is accorded a former sitting judge if the complaint against him arose from his judicial acts).

1980.

As to Brady, his alleged falsifications and his continued failure to come forward and correct his alleged wrongful testimony is also covered by absolute immunity because such an act is inextricably tied to his trial testimony.  Allowing such a claim would defeat the purpose of absolute immunity as discussed in *Franklin v. Terr; see also Paine*, 265 F.3d at 980 ("the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action").

Further, Paradis will not be permitted to recast his ITCA-barred and time-barred defamation claims against Haws and his time-barred defamation claims against Brady into "intentional infliction of emotional distress" claims to take advantage of the "continuing tort" exception to the statute of limitations.  Any false media statements did not *cause* Paradis' continued death sentence or incarceration; rather, the alleged defamation may have caused emotional injury, which, again, is only a disguised (and barred) defamation claim.  The media statements, however, may be used as evidence of the failure to disclose evidence that constituted outrageous conduct to the extent that they can be related to the pertinent time periods.

Based on the foregoing, the request for dismissal of the intentional infliction

of emotional distress claims on statute of limitations grounds is denied.  However,

Paradis' Claim VIII against Dr. Brady is barred by absolute witness immunity

under *Franklin v. Terr*.  Paradis will be allowed to proceed on Claim X against

Haws as limited above.

## IX.

## MOTION TO AMEND COMPLAINT

Paradis has failed to file a proposed amended complaint with his Motion.

*See* Local Rule 15.1.  Paradis is cautioned that he should take care to follow the

local rules.  As discussed above, because the causes of action Paradis wishes to add

are subject to the absolute immunity defense, amendment would be futile.

Therefore, the Motion is denied.

## X.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED:

A.      Defendants' Motion to Strike Affidavit of Donald Paradis (Docket

No. 182) is DENIED.  The Motion to Strike the Affidavit of Daniel

Sharp (Docket No. 182) is GRANTED.

B.      Defendants' Motions to Strike Affidavit of William Mauk (Docket

Nos. 189, 190, 191, and 192) are DENIED.

C.      Paradis' Motion for Leave to File An Amended Complaint (Docket
        No. 193) is DENIED.

D.      The Motion for Summary Judgment filed by D. Marc Haws (Docket
        No. 138) is GRANTED except as to Count V, § 1983 conspiracy
        regarding the aspiration of water theory that arose in late June or early
        July and continued through December 10, 1980; Count X(1),
        negligent infliction of emotional distress claim for the same time
        period; and Count X(2) an intentional infliction of emotional distress
        for the same time period.

E.      The Motion for Summary Judgment Based on Qualified Immunity
        filed by George Elliot (Docket No. 145) is GRANTED except as to
        Count V, § 1983 conspiracy regarding the aspiration of water theory
        that arose in late June or early July and continued through December
        10, 1980.

F.      The Motion for Summary Judgment Based on Absolute and Qualified
        Immunity filed by Glen E. Walker (Docket No. 152-1) is GRANTED
        in full as to all claims asserted against him in his individual capacity.

G.      The Motion for Summary Judgment Based on Absolute and Qualified
        Immunity filed by Peter C. Erbland (Docket No. 152-2) is

**MEMORANDUM ORDER  -  66**

GRANTED.

H.    The Motion for Summary Judgment filed by William J. Brady

(Docket No. 156) is GRANTED as to all claims.

I.    The Motion to Dismiss filed by William J. Brady (Docket No. 157) is

GRANTED to the extent reflected above.

J.    Paradis' Motion for Extension of Time to File List of Lay and Expert

Witnesses and Motion to Amend Scheduling Order (Docket Nos. 200-

1 and 200-2) are GRANTED in part and DENIED in part.

K.    The modified pretrial schedule shall be as follows.

1.    <u>Completion of Discovery</u>:  All discovery will be completed by
**July 31, 2006**.  This is a deadline for the <u>completion</u> of all
discovery; it is not a deadline for discovery <u>requests</u>.  Discovery
requests must be made far enough in advance of this deadline to
allow completion of the discovery by the deadline date.  The
parties may, by stipulation, agree to defer some trial-related
discovery, such as discovery related to damages issue, until
after the Court has ruled any dispositive issues.  The parties
may agree to conduct additional discovery to be completed no
later than **September 1, 2006**; however, the Court will not
entertain any Rule 56(f) motions or delay trial as a result of any
discovery conducted after July 31, 2006.

2.    <u>Disclosure of Lay Witnesses</u>:  Plaintiff shall disclose all lay
witnesses intended to be called at trial and a summary of the
substance of their testimony by **April 14, 2006.**

3.    <u>Disclosure of Experts</u>:
a.    Plaintiff shall disclose the experts intended to be
called at trial, their reports, and the substance of

their testimony on or before **April 14, 2006**.

 b. Defendants shall disclose the experts intended to be called at trial, their reports, and the substance of their testimony on or before **June 9, 2006**.

 4. All rebuttal experts, their reports, and the substance of their testimony shall be identified on or before **June 30, 2006**.

 5. <u>Rules Governing Disclosure of Expert Witnesses</u>: Within the deadlines for the disclosure of expert witnesses set out above, the parties shall also provide – for each expert disclosed – the report described in Fed. R. Civ. P. 26(a)(2)(B), as modified by Local Rule 26.2(b). Supplementation to the expert witness report shall be done in accordance with Fed. R. Civ. P. 26(e)(1). Pursuant to Local Rule 26.2(b), expert witnesses will not be allowed to offer any opinion not disclosed in the mandatory Rule 26 disclosures, supplementation, or deposition. This includes rebuttal experts. No undisclosed expert rebuttal opinion testimony will be allowed at trial.

 6. Dispositive Motions. All dispositive motions are due no later than **August 1, 2006**.

 7. <u>Trial</u>. The Court shall conduct a 3-week jury trial beginning **October 2, 2006**, at 1:30 p.m.

DATED: **March 31, 2006**

B. LYNN WINMILL
Chief Judge
United States District Court

**MEMORANDUM ORDER -  68**